**CARDTOONS, L.C., an Oklahoma Limited Liability Company, Plaintiff—Appellant,**

v.

**MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, an unincorporated association, Defendant—Appellee.**

No. 98–5061.

United States Court of Appeals, Tenth Circuit.

June 29, 1999.

James W. Tilly (Craig A. Fitzgerald with him on the briefs), Tilly & Associates, Tulsa, Oklahoma, for Plaintiff—Appellant.

Russell S. Jones, Jr. (William E. Quirk and Leslie A. Greathouse of Shughart Thomson & Kilroy, Kansas City, Missouri,

and James E. Weger of Jones, Givens, Gotcher & Bogan, Tulsa, Oklahoma, with him on the brief), Shughart Thomson & Kilroy, Kansas City, Missouri, for Defendant—Appellee.

Before EBEL, McWILLIAMS and LUCERO, Circuit Judges.

LUCERO, Circuit Judge.

This case requires us to decide whether *Noerr-Pennington* immunity can attach to threats of litigation made with probable cause. Applying the "objectively baseless" test articulated in *Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.*, 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the district court concluded that the non-consummated threats of a lawsuit made by the Major League Baseball Players Association to Cardtoons and Champs Marketing, Inc., enjoy *Noerr-Pennington* protection. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## I

Cardtoons, L.C. ("Cardtoons"), produces parody trading cards that feature caricatures of active major league baseball players.[1] Cardtoons contracted with Champs Marketing, Inc. ("Champs"), an Ohio corporation, to print the cards. Major League Baseball Players Association ("MLBPA"), the exclusive collective bargaining agent for all active major league baseball players, is the assignee of the publicity rights of current players and handles licensing agreements authorizing the use of their identities.

In a letter to Cardtoons dated June 18, 1993 ("Cardtoons letter"), MLBPA claimed that by producing and selling the cards, Cardtoons was "violat[ing] the valuable property rights of MLBPA and the players." The MLBPA threatened to "pursue its full legal remedies" if Cardtoons refused to cease production and sale of the cards. Appellant's App. at 8–9. In a similar letter dated the same day ("Champs letter"), MLBPA also threatened Champs with litigation if it did not stop "participating in Cardtoons's illegal activities." Appellant's App. at 10. Upon receipt of the letter, Champs notified Cardtoons that it intended to stop printing the cards.

Four days later, Cardtoons filed suit in federal district court for a declaratory judgment on the issue of whether its cards violated MLBPA's publicity and intellectual property rights. Also seeking injunctive relief,[2] Cardtoons asked the court to bar MLBPA from interfering with Champs and other third parties involved in the production and sale of the cards. Additionally, the suit alleged that MLBPA had tortiously interfered with Cardtoons's contractual relations with Champs. MLBPA moved to dismiss the complaint for lack of subject matter jurisdiction, and filed counterclaims seeking declaratory judgment, injunctive relief, and damages under Oklahoma's publicity rights statute, Okla. Stat. tit. 21 § 839.1 and 839.2 (1993).

Unless Cardtoons was entitled to produce and sell the cards, as alleged in the claim for declaratory judgment, it could not recover damages on the tortious interference claims. Therefore, the parties agreed that before the adjudication of Cardtoons's tort claim, a magistrate judge should conduct an evidentiary hearing and issue a report limited to Cardtoons's declaratory judgment claim and MLBPA's counterclaims.

---

1. A more thorough description of the humorous cards, as well as the less humorous litigation surrounding the cards' production, can be found in *Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 95 F.3d 959, 962–64 (10th Cir.1996).

2. As part of its request for injunctive relief, Cardtoons sought a temporary restraining order and preliminary injunction to prevent MLBPA from interfering with Cardtoons's contractual relations with Champs. Cardtoons subsequently withdrew its request for these additional remedies when they were rendered moot by Champs's decision to stop producing the cards.

Concluding that Cardtoons's activities violated the baseball players' rights of publicity under Oklahoma law, the magistrate recommended judgment on these claims in favor of MLBPA. The district court initially adopted the recommendation. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 838 F.Supp. 1501 (N.D.Okla.1993). Following the Supreme Court's decision in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), however, the district court concluded that the parody cards enjoyed First Amendment protection against MLBPA's infringement claims. Accordingly, the court vacated its initial decision and entered judgment for Cardtoons. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 868 F.Supp. 1266 (N.D.Okla.1994) (*"Cardtoons I"*). We affirmed, holding that the parody cards are "an important form of entertainment and social commentary that deserve First Amendment protection." *Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 95 F.3d 959, 976 (10th Cir.1996) (*"Cardtoons II"*).

Having prevailed on the declaratory judgment claim, Cardtoons returned to the district court to pursue its claims for damages against MLBPA. In addition to the claim for tortious interference with contract, Cardtoons asserted new claims for prima facie tort, libel, and negligence, all stemming from the allegations contained in the Cardtoons and Champs letters. Concluding that both letters were immune from liability under the *"Noerr-Pennington"* doctrine, the district court granted summary judgment for MLBPA and dismissed all of Cardtoons's state law claims. *See Cardtoons, L.C., v. Major League Baseball Players Ass'n*, No. 93–C–576–E (N.D.Okla. Mar. 12, 1998) (*"Cardtoons III"*). Cardtoons challenges the court's application of the *Noerr-Pennington* doctrine and appeals the grant of summary judgment.[3] Cardtoons also appeals the court's decision to stay discovery pending

its ruling on MLBPA's motion for summary judgment.

## II

■ As originally articulated, the *Noerr-Pennington* doctrine provides general immunity from antitrust liability to private parties who petition the government for redress, notwithstanding the anticompetitive purpose or consequences of their petitions. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135–38, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (establishing immunity for petitions to state legislature); *see also United Mine Workers of America v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (extending *Noerr* immunity to petitions of public officials). The Court later extended *Noerr-Pennington* immunity to the right of access to courts. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (citations omitted). Moreover, because it emanates from the First Amendment right of petition, *see Bright v. Moss Ambulance Service, Inc.*, 824 F.2d 819, 821 n. 1 (10th Cir.1987) (quoting *City of Lafayette, La. v. Louisiana Power & Light Co.*, 435 U.S. 389, 399, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)), *Noerr-Pennington* immunity stands independent of its aborigine roots in antitrust, *see, e.g., Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 742–43, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (immunizing employer from prosecution for unfair labor practice even if an otherwise valid suit against employee is driven by a retaliatory motive); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913–14, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (immunizing a nonviolent business boycott seeking to vindicate economic and equal rights); *South Dakota v. Kansas City Southern Indus., Inc.*, 880 F.2d 40, 50 (8th Cir.1989) (immunizing defendant from claim of interference with contractual relations).

---

3. In its briefs, Cardtoons seems to appeal the grant of summary judgment only with respect to the Champs letter. We note, however, that

our conclusions would not change if the appeal also involved the Cardtoons letter.

■ Although broad and extensive, *Noerr-Pennington* immunity is not a shield for a petitioner whose conduct, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor." *Noerr,* 365 U.S. at 144, 81 S.Ct. 523. The Supreme Court has established a two-part definition of sham litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," *Noerr,* 365 U.S. at 144, 81 S.Ct. 523, through the "use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon," *Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

*Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.,* 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

■ To ascertain "baselessness," a court must consider whether the litigant had "probable cause" to initiate the legal action. *Id.* at 62, 113 S.Ct. 1920. If there is probable cause, the defendant automati-cally enjoys *Noerr-Pennington* immunity, and the second, subjective motivation prong of the *Professional Real Estate* test becomes irrelevant. *See id.* at 63, 113 S.Ct. 1920. Probable cause to sue may exist when the law is unsettled or when an "action [is] arguably 'warranted by existing law' or at the very least [is] based on an objectively 'good faith argument for the extension ... of existing law.'" *Id.* at 65, 113 S.Ct. 1920 (quoting Fed.R.Civ.P. 11).

■ Neither the Supreme Court nor this circuit has directly addressed the issue of whether *Noerr-Pennington* immunity attaches to the mere threat of a law suit. Confronted with this issue, however, three other circuits have concluded that prelitigation threats of suit enjoy the same immunity as litigation itself, so long as the threats are not shams. *See McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1558–60 (11th Cir.1992); *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 850–51 (1st Cir.1985); *Coastal States Mktg., Inc. v. Hunt,* 694 F.2d 1358, 1367 (5th Cir.1983). In so holding, the Fifth Circuit reasoned that "it would be absurd to hold that [petitioning immunity] does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning." *Coastal States,* 694 F.2d at 1367. Commentators have agreed with this extension and have further developed the policy rationales behind it. *See, e.g.,* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 205e at 237 (rev. ed.1997) (withholding immunity from prelitigation communication would curb practices that "provide useful notice and facilitate the resolution of controversies"); Herbert Hovenkamp, *Federal Antitrust Policy* § 18.3d at 644 (1994) (immunizing prelitigation threats is vital to "[o]ur entire dispute resolution process[, which] is designed to encourage people to resolve their differences if possible before litigating").[4]

---

**4.** Applying *Noerr-Pennington* protection to prelitigation threats is especially important in the intellectual property context, where warning letters are often used as a deterrent against infringement. *See, e.g., Matsushita Electronics Corp. v. Loral Corp.,* 974 F.Supp. 345, 359 (S.D.N.Y.1997) (concluding that policing letters sent to suspected patent infring-

We adopt the legal and policy rationales that have informed other circuits' extension of *Noerr-Pennington* immunity to prelitigation threats, and hold that whether or not they are consummated, such threats enjoy the same level of protection from liability as litigation itself.[5] In addition, when considering whether prelitigation threats enjoy *Noerr-Pennington* immunity, we conclude that we must apply the two-part sham test of *Professional Real Estate.*[6]

## III

■ "We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c)." *Kaul v. Stephan,* 83 F.3d 1208, 1212 (10th Cir.1996) (citation and internal quotation omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any materi-

al fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In the *Noerr-Pennington* context, "a court may decide probable cause as a matter of law" at the summary judgment stage when a defendant raises *Noerr-Pennington* immunity as a defense and the predicate facts are undisputed. *Professional Real Estate,* 508 U.S. at 63, 113 S.Ct. 1920.

## A

■ If MLBPA had probable cause to threaten Champs with litigation, the Champs letter enjoys *Noerr-Pennington* immunity under the *Professional Real Estate* test. To determine whether there was probable cause, we must first consider the validity of the underlying threatened action—the infringement suit against Cardtoons for its parody cards—and then turn to the validity of a cause of action against Champs as the printer of the cards.

---

ers enjoyed *Noerr-Pennington* immunity); *Thermos Co. v. Igloo Products Corp.,* 1995 WL 842002, *4 (N.D.Ill. Sept.27, 1995) (same, for policing letters to alleged trademark infringers); *see generally* Ronald B. Coolley, Notifications of Infringement and Their Consequences, 77 *J. Pat. & Trademark Off. Soc'y* 246, 246 (1995) (describing notification of suspected intellectual property infringers as a "common reaction" of rights holders).

5. The dissent would bifurcate the test for granting *Noerr-Pennington* immunity by applying the more lenient *Professional Real Estate* standard when a party files suit, while requiring a party who merely issues a threat to demonstrate that he acted both in "good-faith" and as a "proximate prologue to actual or imminent litigation." Diss. Op. at 1142. This approach creates an incentive to litigate, and would not, as the dissent maintains, protect poorly financed entities like Champs from "private bullying communication." Diss. Op. at 1141. Instead, such companies would become more vulnerable to ruinous lawsuits, as the threatening letter takes the form of a legal complaint.

6. All of the prelitigation cases from other circuits were decided before *Professional Real Estate,* and provide us with no uniform standard to determine when a threat to litigate is

worthy of *Noerr-Pennington* protection. *See, e.g., McGuire Oil,* 958 F.2d at 1560–61 & n. 12 (applying subjective test and objectively baseless test); *CVD,* 769 F.2d at 851 (applying both a "bad faith" test and a test for clear and convincing evidence that the defendant's claim was objectively baseless); *but see Coastal States,* 694 F.2d at 1372 ("A litigant should enjoy petitioning immunity from the antitrust laws so long as a genuine desire for judicial relief is a significant motivating factor underlying the suit."). We note, however, that to the extent these cases are inconsistent with *Professional Real Estate,* they are unfaithful to the *Noerr-Pennington* doctrine. *See Professional Real Estate,* 508 U.S. at 57, 60, 113 S.Ct. 1920 (describing the "objective reasonableness" test as part of the "original formulation" of the *Noerr-Pennington* sham exception, and declaring that "fidelity to precedent compels us to reject a purely subjective definition of 'sham' "). Indeed, the Eleventh Circuit, when applying a test for sham litigation after the Supreme Court had granted certiorari but before it had decided *Professional Real Estate,* implied that whatever test the Supreme Court articulates for granting immunity for litigation under *Noerr-Pennington* must similarly apply to prelitigation threats. *See McGuire Oil,* 958 F.2d at 1560–61 & n. 12.

Prior to our decision in *Cardtoons II,* the only federal appellate court decision addressing the constitutional tensions inherent in a celebrity parody provided some legal support for MLBPA's allegations against Cardtoons. *See Cardtoons II,* 95 F.3d at 970 (discussing *White v. Samsung Electronics America, Inc.,* 971 F.2d 1395 (9th Cir.1992)). At the time of its prelitigation threats against Champs, MLBPA therefore had probable cause to believe that Cardtoons's parody cards infringed its publicity rights. Furthermore, as *Cardtoons II* demonstrates, MLBPA's infringement claim was premised on a reasonable argument that its publicity rights outweighed Cardtoons's free speech rights. *See Cardtoons II,* 95 F.3d at 970–76 (applying balancing test and concluding that Cardtoons's speech rights prevail over MLBPA's property rights). Therefore, although MLBPA's infringement claim did not prevail, our prior adjudication shows that "a similarly situated reasonable litigant could have perceived some likelihood of success." *Professional Real Estate,* 508 U.S. at 65, 113 S.Ct. 1920. As such, the district court could reasonably conclude that MLBPA's threats against Cardtoons were "an objectively plausible effort to enforce rights" and deserved *Noerr-Pennington* protection. *Id.*

Cardtoons argues that even if MLBPA's threats against Cardtoons enjoy immunity, our decision in *Cardtoons II* does not resolve the issue of whether *Noerr-Pennington* immunity attaches to the Champs letter. In *Cardtoons II,* we applied Oklahoma's statutory right of publicity law. Here, Cardtoons asserts, Ohio's common law of publicity rights controls because Ohio is the locus of Champs's conduct and its state of residence, and therefore has the most significant contacts to the torts alleged. Ohio's "incidental use" exception to the right of publicity, Cardtoons contends, provides MLBPA with less protection for its publicity rights than it enjoyed under Oklahoma law. Under Ohio law, therefore, MLBPA lacked probable cause for its threats against Champs.

■ Ohio law recognizes an incidental use exception to its right of publicity law that applies when a person's name or likeness is used "for purposes other than taking [commercial] advantage of his reputation, prestige, or other value associated with him." *Zacchini v. Scripps–Howard Broadcasting Co.,* 47 Ohio St.2d 224, 351 N.E.2d 454, 459 n. 4 (Ohio), *rev'd on other grounds,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (quotation and internal citation omitted). In our prior adjudication, we specifically noted that Oklahoma's right of publicity statute also contains a provision that is analogous to the concept of "incidental use." *See Cardtoons II,* 95 F.3d at 968. We discern no marked difference between the incidental use exception in Oklahoma and Ohio. In both states the applicability of the exception turns on the degree to which a defendant derives commercial benefit from its use of the plaintiff's name or likeness. *See* 12 Okla. Stat. title § 1449(E) (1999) (stating that whether the use of a person's "likeness [is] so directly connected with commercial" activity as to constitute a violation of the right of publicity presents a question of fact); *Zacchini,* 351 N.E.2d at 458 n. 4 (stating that although the incidental use exception under Ohio law does not apply to the commercial exploitation of another's likeness, the mere fact that a defendant "seeks to make profit" from his endeavor is not enough to establish commercial use).

Moreover, MLBPA had a colorable claim for infringement under Ohio law. One Ohio court has applied the incidental use exception in a situation in which the defendant used an Olympic athlete's name and likeness in the context of accurate, historical information on disposable drinking cups. *See Vinci v. American Can Co.,* 69 Ohio App.3d 727, 591 N.E.2d 793, 794 (Ohio Ct.App.1990). Because this use was not meant to support or promote the cups, the court found it to be merely incidental. *See id.* In our conclusion in *Cardtoons II* that the Oklahoma incidental use exception was inapplicable to the parody cards, we noted that "the players were specifically

selected for their wide market appeal," and the use of their likeness was "directly connected with a proposed commercial endeavor." *Cardtoons II*, 95 F.3d at 968. Accordingly, MLBPA's claim would not have been foreclosed under Ohio law.

Even if MLBPA had probable cause to assert a claim of infringement against Champs in Ohio, Cardtoons argues, MLBPA lacked probable cause for the Champs letter because as a printer, Champs was a passive actor and is liable as a contributory tort infringer only if it knew or had reason to know that it was aiding and abetting an infringement. *See, e.g., Misut v. Mooney*, 124 Misc.2d 95, 475 N.Y.S.2d 233, 236 (N.Y.Sup.Ct.1984); *Maynard v. Port Publications, Inc.*, 98 Wis.2d 555, 297 N.W.2d 500, 507 (Wis. 1980). The Champs letter, however, provided the very notice that *Misut* and *Maynard* require. Cardtoons cannot argue that Champs was not liable unless it had notice of an infringement, while also contending that MLBPA rendered itself ineligible for *Noerr-Pennington* immunity by providing the required notice.[7]

We therefore need not resolve the conflict of law and publicity rights issues that Cardtoons raises, because under either potentially controlling legal regime, MLBPA would have had probable cause on its infringement claim against Champs. Accordingly, the Champs letter enjoyed *Noerr-Pennington* immunity as a threat of litigation.

**B**

■ Cardtoons contends that *Noerr-Pennington* immunity does not extend to its libel claim against MLBPA, which is based not on the MLBPA's threat of litigation but on the allegations in the Champs letter that Cardtoons violated the law. Specifically, the Champs letter states, "[MLBPA] believe[s] that the activities of [Cardtoons] violate the valuable property rights of publicity of the MLBPA and the players themselves." Appellant's App. at 10. The letter contains no further statements of fact or law concerning Cardtoons and its activities, except to characterize them as "illegal." *Id.*

■ We hold that a defendant like MLBPA, who has probable cause to threaten litigation and makes no assertion beyond the legal and factual bases for the threats, may enjoy *Noerr-Pennington* immunity from a claim of libel. This holding is not inconsistent with *McDonald v. Smith*, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). There, the Court held that the First Amendment does not provide absolute immunity for petitions to the government that express libelous and damaging falsehoods. *See id.* at 485, 105 S.Ct. 2787. In so holding, the Court relied on the principle at the core of the *Noerr-Pennington* doctrine that " 'baseless litigation is not immunized by the First Amendment right to petition.' " *Id.* at 484, 105 S.Ct. 2787 (quoting *Bill Johnson's Restaurants*, 461 U.S. at 743, 103 S.Ct. 2161).

We have already concluded that MLBPA's threats of litigation were not baseless because it had probable cause to assert a publicity rights infringement claim against Cardtoons. The statements that Cardtoons labels as libelous are coextensive with the threats of litigation to which we have already attached *Noerr-Pennington* immunity. If Cardtoons's argument prevails, a defendant would be exposed to libel claims even if his litigation or threat to litigate were supported by probable cause. By allowing an alternative cause of action against petitions that are otherwise eligible for immunity, the argument renders *Noerr-Pennington* a nullity.

---

7. Moreover, the law of contributory infringement in the publicity rights context is not so settled that it would foreclose MLBPA from making a good faith argument for the extension of existing law by asserting a claim against Champs. *See* 1 J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 3.7[E] (1999) (arguing that contributory infringement of a publicity right by a "passive actor" is a colorable claim for which there should be liability).

## IV

■ Cardtoons argues that it was prejudiced by the district court's stay of discovery pending its adjudication of MLBPA's summary judgment motion. It claims the stay barred it from attempting to discover whether MLBPA had any intent to pursue legal action against Champs, and whether MLBPA had performed any research on potential legal claims prior to issuing the threatening letters. Furthermore, Cardtoons claims that it hoped to discover evidence of MLBPA's subjective intent to dissuade Champs from performing its legitimate duties under its contract with Cardtoons.

Under the *Professional Real Estate* test, however, MLBPA's subjective intent would have been relevant only if its threats were objectively baseless. MLBPA presented sufficient predicate facts to demonstrate to the district court that as a matter of law, MLBPA had probable cause to threaten suit against Cardtoons and Champs, and that therefore its threats were not objectively baseless. Having affirmed the district court's conclusion that MLBPA is immune from all of Cardtoons's state law claims, we must affirm the district court's stay of discovery. *See Professional Real Estate*, 508 U.S. at 65–66, 113 S.Ct. 1920 (holding that without proof that defendant's infringement action was objectively baseless, circuit court correctly denied request for further discovery).

The district court's opinion is **AFFIRMED.**

EBEL, Circuit Judge, dissenting.

Although I agree with much of the majority opinion, I respectfully dissent from its holding that (1) prelitigation threats, "whether or not they are consummated . . . enjoy the same level of protection from liability as litigation itself" under the First Amendment doctrine of *Noerr–Pennington;* and (2) "when considering whether prelitigation threats enjoy *Noerr–Pennington* immunity . . . we must apply the two-part sham test" of *Professional Real Estate Investors, Inc. v. Co-*

*lumbia Pictures, Inc. (PRE)*, 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Maj. Op. at 1136–37. The first holding is flawed because it assumes that all threats of litigation between *private parties* constitute petitions to the government (which is solely what *Noerr–Pennington* protects). The second holding is flawed because *PRE* determines only whether an acknowledged governmental petition is a sham undeserving of *Noerr–Pennington* immunity, but does not determine whether purely private communications that never go to the government should be considered a governmental petition in the first place. Therefore, granting *Noerr–Pennington* immunity to all prelitigation threats that satisfy *PRE*'s sham test wrongly extends *Noerr–Pennington* by immunizing a whole host of prelitigation threats that cannot meet even the threshold criteria of facially presenting a petition to the government. Considered together, the majority's holdings may be read to stand for the proposition that all private correspondence between private parties that threaten objectively reasonable litigation shall be deemed to be petitions to government entitled to *Noerr–Pennington* immunity. To state this proposition is to refute it.

Starting with fundamentals, the *Noerr–Pennington* doctrine, which provides immunity for petitions to the government, derives from the First Amendment right "*to petition the government* for a redress of grievances." U.S. Const. amend. I (emphasis added). The Supreme Court has established that actual litigation is a form of petitioning the government protected by the First Amendment. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (defendants entitled to *Noerr–Pennington* for instituting state and federal proceedings because right to petition includes "right of access to the courts"); *PRE*, 508 U.S. at 60, 113 S.Ct. 1920 (litigation is protected under *Noerr–Pennington* if it is not sham). However, it is an unwarranted leap neither compelled by the text of the First Amend-

ment, nor the *Noerr–Pennington* line of cases from the Supreme Court or our circuit, to conclude that all purely private correspondence threatening suit constitutes a "petition [to] the government" under the First Amendment.[1]

Indeed, the facts of this case belie any suggestion that the MLBPA actually petitioned the government with regard to the threatening letter at issue here—specifically, the letter to Champs. The MLBPA's cease-and-desist letter to Champs threatening suit was never sent to the government; did not ask the government for any response or "redress of grievances"; was not even known to the government prior to Cardtoons' declaratory judgment action against the MLBPA; and did not ever result in any litigation. It seems an unreasonable stretch to shield this purely private correspondence between the MLBPA and Champs under the *Noerr–Pennington* aegis as a petition to the government.

Besides this textual problem, according *Noerr–Pennington* immunity to purely private correspondence poses practical problems. First, the government has supervisory power to prevent the misuse of actual petitions to the government. With litigation, for example, a district court has power under Fed.R.Civ.P. 11 to supervise pleadings, motions, and other representations "present[ed] to the court," and to issue sanctions for violations of the rule. In contrast, the government has much more limited power to regulate the misuse of purely private correspondence because such correspondence will seldom be brought to the government's attention.

Second, the majority's extension of *Noerr–Pennington* immunity to prelitigation threats will prove difficult to implement. How far back in time should *Noerr–Pennington* immunity extend prior to an actual petition to the government? Litigation is often preceded by lengthy communications of an increasingly acrimonious nature. How early into the process would the majority extend immunity? Would the majority go back to include the first tentative statement of disagreement over the interpretation of a contract, perhaps even before litigation is contemplated? Would it apply *Noerr–Pennington* even earlier to the structuring of business deals in the first instance, where considerations of potential litigation are often spoken or unspoken factors? Does the word "litigation" have to be explicitly mentioned in the communication in order for it to be privileged, or may it be implied?

Here, all these difficult questions are enormously compounded because no litigation ever actually resulted between the MLBPA and Champs. The threatening cease-and-desist letter from the MLBPA did not at any time—even to today—culminate in an actual petition to the government against Champs. Indeed, Cardtoons suggests that the MLBPA commonly uses such threats of expensive litigation to bully poorly-financed entities who might tarnish the image of professional baseball players—regardless of whether the MLBPA has any intention to petition the government with a follow-up lawsuit. If this claim can be proven, then it escapes me why such private bullying communication should receive *Noerr–Pennington* immunity as if it were a petition to the government just because it may state some theoretical but objectively supported claim. When a large company has a practice of threatening others in purely private correspondence without any intent or custom to follow through with actual litigation, there is no basis for awarding *Noerr–Pennington* immunity under the fiction that the company has petitioned the government. Granting *Noerr–Pennington* immunity to this type of correspondence declares open season for companies to engage in libelous, anticompetitive, or otherwise unlawful communications without fear of legal repercussion.

---

**1.** In fact, the majority admits that "[n]either the Supreme Court nor this circuit has directly addressed the issue of whether *Noerr–Pen-* *nington* immunity attaches to the mere threat of a law suit." Maj. Op. at 1136.

These textual and practical problems illustrate the imprudence of extending *Noerr–Pennington* immunity to all prelitigation threats. Simply put, if all such threats between private parties constitute petitions to the government, as the majority premises, then the First Amendment's protection of the right "to petition the government" is transmogrified into a generalized constitutional immunity for private disputes not involving the government in any form. Rather than suffer such a revision of the First Amendment, I would revise the majority's premise.

*Noerr–Pennington* should protect only prelitigation threats that have a strong and compelling nexus to actual litigation such that the threat may be considered an incipient part of a petition to the government. To prove this nexus, I would require the party invoking *Noerr–Pennington* to show that its prelitigation threat was a (1) good-faith, (2) objectively reasonable, and (3) proximate prologue to actual or imminent litigation.[2]

Each element of this three-part test is essential to properly limit the reach of *Noerr–Pennington* with respect to prelitigation threats. *First,* the prelitigation threat must be in good faith to ensure that *Noerr–Pennington* immunity would not protect a private party who sends a threatening communication without any actual bona-fide intent to petition the government. This good-faith requirement is consistent with all circuit cases applying *Noerr–Pennington* to threats of litigation, as these cases implicitly require such threats to be in good-faith. *See McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1559–60 (11th Cir.1992) (stating that sham exception subjects to antitrust liability defendant whose activities, including threats of litigation, "are not *genuinely aimed* at procuring favorable government action at all" (emphasis added; quotations omitted)); *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 851 (1st Cir.1985) ("[W]e hold that the

threat of unfounded trade secrets litigation *in bad faith* is sufficient to constitute a cause of action under the antitrust laws, provided that the other essential elements of a violation are proven." (emphasis added)); *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1367, 1372–73 (5th Cir.1983) (finding threats of litigation and ensuing litigation protected by petitioning immunity because they were in good faith); *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1200, 1203 (8th Cir.1982) (refusing to grant *Noerr–Pennington* immunity to "a broad pattern of litigation threats and harassment" where they were not "in *good faith*" but rather "clearly constitute[d] *bad faith* unlawful harassment" (emphasis added)); *cf. American Potato Dryers v. Peters,* 184 F.2d 165, 173 (4th Cir.1950) (in pre-*Noerr–Pennington* case, holding that "threats of suit ... made in *good faith*" were not antitrust violations (emphasis added)).

Furthermore, contrary to what the majority intimates, *see* Maj. Op. at 1136–37 n. 5, 1139–40, this requirement is consistent with *PRE*'s two-part sham test. That test engages in a subjective inquiry only if the litigation first is determined to be objectively baseless. *See PRE,* 508 U.S. at 60, 113 S.Ct. 1920. By its facts and terms, however, *PRE* applies to *litigation,* i.e., an actual lawsuit. *See id.* ("We now outline a two-part definition of 'sham' *litigation.* First, the *lawsuit* must be objectively baseless.... Only if the challenged *litigation* is objectively meritless may a court examine a *litigant's* subjective motivation." (emphasis added).) *PRE*'s sham litigation test determines whether a petition to the government (in lawsuit form) qualifies for *Noerr–Pennington* immunity. However, *PRE* provides no guidance on whether or when a *prelitigation threat* between private parties constitutes as a petition to the government. Hence, before we can apply *PRE* to determine which prelitigation

---

**2.** This test differs from the majority's test because the majority would grant *Noerr–Pennington* immunity solely on the ground of an objectively reasonable basis for the threat

without also requiring that the threat be in good faith and proximate to actual or imminent litigation.

threats, as petitions to the government, merit *Noerr–Pennington* immunity, we first must decide which prelitigation threats amount to petitioning activity. Requiring good-faith in this threshold inquiry, therefore, does not conflict with *PRE*, as *PRE* does not come into play until after the prelitigation threat is determined to be a petition to the government.[3] On the other hand, granting *Noerr–Pennington* immunity to all prelitigation threats that satisfy *PRE*, without winnowing out threats that cannot qualify as petitions to the government, erroneously extends *Noerr–Pennington* immunity beyond First Amendment activity.

*Second,* the objectively reasonable test is necessary to prevent *Noerr–Pennington* immunity from attaching to prelitigation threats that would have no basis as an actual petition, and therefore should not receive protection as petitioning activity. This element is coextensive with the objective prong of *PRE*.

*Third,* the proximity element ensures that *Noerr–Pennington* would immunize only those communications that are attendant to imminent or actual litigation and consequently may be considered an initial part of the petitioning process. If no petition actually results, it should be more difficult to establish proximity because the party claiming immunity should have to show some intervening cause that aborted an otherwise imminent petition.

Applied to the instant case, the three-part test cannot be met. Although I agree with the majority that the prelitigation threat in the MLBPA's letter to Champs had an objective basis, I do not believe the record in its undeveloped state allows us to determine whether the MLBPA's correspondence with Champs was in good-faith or proximate to actual litigation. As Cardtoons complains, the district court stayed discovery on the MLBPA's subjective in-

tent regarding its threats pending summary judgment. I therefore would reverse the district court's entry of summary judgment in favor of the MLBPA on the ground that the MLBPA enjoyed *Noerr–Pennington* immunity, and remand to allow Cardtoons to proceed with discovery on the MLBPA's subjective intent in threatening Champs with litigation, and the proximity of that threat to actual litigation.

---

**3.** As a result, the majority is wrong to imply that *PRE.* contradicts the earlier circuit cases requiring threats of litigation to be in good faith in order to receive *Noerr–Pennington* immunity. While *PRE* may limit those cases to the extent that they also require actual litiga-

tion to be brought in good faith without first inquiring into objective baselessness, *PRE* does not touch upon the subjective test for whether threats of litigation should receive petitioning immunity.